**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| KOTESHWAR VELUDHANDI,<br>Plaintiff,<br>vs.<br>GENERAL MOTORS LLC,<br>Defendant. | CIVIL ACTION NO:<br>1:19-CV-03892-ODE-CCB |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant General Motors LLC ("Defendant" or "GM") hereby submits this Memorandum of Law in Support of Defendant's Motion for Summary Judgment, and asks the Court to dismiss all of Plaintiff's claims with prejudice.

## I. SUMMARY OF FACTS[1]

### A. Plaintiff's Employment.

GM is an American automotive company headquartered in Detroit that designs, manufactures, markets, and distributes vehicles. [Statement of Undisputed Material Facts ("SOMF") ¶ 1]. GM is an equal opportunity employer, with policies prohibiting discrimination, retaliation, and harassment based on *inter alia* race,

1 Defendant is separately filing a Statement of Material Facts and incorporates those facts by reference herein. Defendant includes only a brief summary of the facts in this Memorandum of Law.

national origin, and disability. [SOMF ¶10]. GM also maintains a Reasonable Accommodation policy that provides that "[t]he policy of the Company is to make reasonable accommodation to the limitations of qualified individuals with disabilities and to extend employment opportunities to such persons." [SOMF ¶11]. GM hired Plaintiff in November 2015 as a Senior Java Developer. [SOMF ¶1]. Plaintiff is Indian-American. [Doc. 01 ¶10]. Plaintiff reported directly to IT Manager Damon Goins (African-American)–who also made the decision to hire Plaintiff—throughout the course of his employment. [SOMF ¶¶2-3].[2] Plaintiff liked working for Goins, and "didn't have an issue" with him. [SOMF ¶6].

In his role, Plaintiff served primarily as a software developer working on projects for GM's car systems. [SOMF ¶5]. According to the job description, this role involves "[c]oding, unit testing and debugging applications in various software languages . . . work[ing] closely with senior developers and software engineers . . . [and] [p]ro-actively engag[ing] in the remediation of software issues such as code quality, pattern mismatch, and security issues related to the code/configuration."

---

2 Also on Goins' team, Plaintiff's co-workers, were: Terriance Woodard (African-American), Brittany Summerlyn (African-American), Zhang "Paula" Sun (Asian-American), Andrew Andoyar (African-American), Drew Hopkins (Caucasian), Eric Olsen (Caucasian), and Satyaban Mohapatra (Indian-American). [SOMF ¶4].

[SOMF ¶7]. Plaintiff's role further involved issue spotting, problem solving and collaborating with others on his team. [SOMF ¶8].

### B. Plaintiff's Performance Struggles.

In May 2016, Plaintiff instigated an altercation with a co-worker, Terriance Woodard.[3] [SOMF ¶12]. Specifically, Goins assigned Plaintiff to a project, and the project lead (Woodard) asked a co-worker (Zhang "Paula" Sun) to help Plaintiff with the task.[4] [SOMF ¶13]. Plaintiff, however, refused Sun's help and became aggressive and argumentative with Sun and Woodard, insisting he did not want any help. [SOMF ¶15]. Woodard asked Goins to mediate the dispute. [SOMF ¶16]. On May 18, 2016, Goins met with Woodard and Plaintiff to discuss the dispute, but Plaintiff stated he would not talk to Goins with Woodard in the room. [SOMF ¶17]. During this meeting, Plaintiff continued to be argumentative and was not able to calm down. [SOMF ¶18]. Eventually, Plaintiff shouted, "I can't talk about this right now!" and left the office. [SOMF ¶19].[5]

---

[3] Woodard was a co-worker and peer – not a superior. [SOMF ¶26].

[4] Plaintiff had recently returned from time off for his son's college graduation, so Sun was asked to assist Plaintiff on the project to make sure Plaintiff was up to speed on the project's progression while Plaintiff had been away. [SOMF ¶14].

[5] Goins also met separately with Sun, who told Goins that Plaintiff's behavior was part of a pattern of not working well with his co-workers. [SOMF ¶20].

On May 25, 2016, Goins met with Plaintiff to discuss Plaintiff's conduct and performance. [SOMF ¶21]. Goins communicated that Plaintiff's behavior, including his shouting and unprofessional comments/tone, would not be tolerated. [SOMF ¶22]. During this conversation, Plaintiff stated out of the blue that "in his whole career, he has never had an issue with an African American." [SOMF ¶23]. Goins had not mentioned race and was taken aback, but continued on with the meeting. [SOMF ¶24]. In this same meeting, Goins went over Plaintiff's 2016 mid-year review. [SOMF ¶27]. This review remarked that Plaintiff was mostly on-track regarding his work goals, but included an explicit warning about the incident with Woodard and his behavior and conduct in general. [SOMF ¶28].

### C. Plaintiff's Stroke, Leave of Absence, and Return to Work.

In August 2016, Plaintiff suffered a stroke at work. [SOMF ¶29]. Plaintiff applied for and was granted a leave of absence under GM's Sickness and Accident Policy. [SOMF ¶30]. In January 2017, Plaintiff's doctor released him to return to work, without accommodation, and he returned to his prior position. [SOMF ¶31]. After Plaintiff's return, Goins and his team began to notice drastic changes in Plaintiff's mood, performance, and cognitive functioning. [SOMF ¶ 32]. For example, Goins noted Plaintiff's instability: one minute he would be angry and the next he would be sullen and distant. [SOMF ¶33]. Furthermore, Plaintiff fell behind

on projects, came to meetings unprepared, failed to meet deadlines, and struggled with routine tasks. [SOMF ¶34].

On or around January 30, 2017, Goins met with Plaintiff to go over his 2016 year-end performance review. [SOMF ¶35]. Prior to this meeting, Goins solicited feedback from Plaintiff's team about his performance. [SOMF ¶36]. This feedback was staggeringly negative. One co-worker lamented that she had not "observed any strengths" regarding Plaintiff's 2016 performance. [SOMF ¶37]. The review also noted that Plaintiff's work contributions "were that of a junior developer at best" and that his "work and project assignment have to be closely monitored." [SOMF ¶38].

**D. <u>The February 2017 Incident.</u>**

On February 1, 2017, Goins emailed his Human Resources ("HR") representatives to express concerns about Plaintiff's behavior and his team's concerns about Plaintiff's performance, as discussed during Plaintiff's performance review. [SOMF ¶39]. Then, on February 16, 2017, Goins met with Plaintiff to conduct his annual compensation review. [SOMF ¶40]. During this meeting, Goins explained that–due to Plaintiff's poor performance review–Plaintiff would not be receiving a discretionary bonus. [SOMF ¶41]. Plaintiff told Goins he disagreed with the review, and deserved a bonus. [SOMF ¶42]. Goins explained the bonus process, and encouraged Plaintiff to utilize the Open Door Policy or contact HR if he felt the

decision was unfair. [SOMF ¶43]. In response, Plaintiff became agitated and demanded to speak with GM CEO Mary Barra. [SOMF ¶44]. Plaintiff told Goins that he was "seeking the truth" about his bonus, and that "he would **die for the truth**." [SOMF ¶45]. After this comment, Goins felt deeply concerned about Plaintiff's behavior and again contacted HR for guidance. [SOMF ¶46].

Site HR Manager Lolita Fortenberry arranged to meet with Plaintiff and HR Business Partner Jason Gutierrez on February 22, 2017, about Goins' concerns and Plaintiff's recent behavior. [SOMF ¶47]. Plaintiff refused to attend the meeting. [SOMF ¶49]. Fortenberry explained that if Plaintiff did not meet with her and Gutierrez, he would have to leave work until further notice. [SOMF ¶50]. Plaintiff again refused, and GM Security escorted him out of the building. [SOMF ¶51]. Fortenberry explained that Plaintiff was not to return to work until he received further instructions from HR. [SOMF ¶52].

**E. Plaintiff's Fitness for Duty Test and Subsequent Testing.**

Based on Plaintiff's erratic behavior, performance struggles, his "die for the truth" comment, and his refusal to meet with HR, GM determined that Plaintiff could not return to work until he underwent a medical fitness-for-duty test. [SOMF ¶53]. On February 26, 2017, GM Medical Doctors Don Jones and Jesse Cheng conducted a telephonic fitness-for-duty test with Plaintiff. [SOMF ¶54]. Prior to this

call, Drs. Jones and Cheng reviewed Plaintiff's job description, medical records related to his stroke, and a summary of his recent behavior from Goins and HR. [SOMF ¶55]. On the call, Drs. Jones and Cheng asked Plaintiff a series of questions about how he was feeling, the incidents at work, and the recent feedback from his co-workers. [SOMF ¶56]. Based on their review of the pertinent documents and Plaintiff's responses during the call, Drs. Jones and Cheng required Plaintiff to undergo neuropsychological testing before he could return to work. [SOMF ¶57]. Drs. Jones and Cheng recommended (and GM approved) a two-month paid leave for Plaintiff to get the test. [SOMF ¶58].

For reasons unknown, Plaintiff delayed scheduling the neuropsychological test until December 20, 2017 – almost eight months after the call with Drs. Jones and Cheng. [SOMF ¶59].[6] GM received the Emory University Department of Rehabilitation Medicine Integrated Neuropsychological Diagnostic Report (the "Emory Report") from Plaintiff on March 19, 2018. [SOMF ¶62]. Drs. Jones and Cheng set a call with Plaintiff on April 9, 2018 to discuss the report. [SOMF ¶63].

[6] Plaintiff received full or partial pay during the 8 month delay. [SOMF ¶60]. GM followed up with Plaintiff repeatedly about scheduling the testing but allowed Plaintiff to stay on leave and repeatedly telling him he could not return to work until he completed the testing. [SOMF ¶61].

### F. **The Emory Report and Plaintiff's Termination.**

Drs. Jones and Cheng closely analyzed the Emory Report, along with Plaintiff's job description (which listed the essential functions of his position). [SOMF ¶64]. Based on their analysis, Drs. Jones and Cheng determined that Plaintiff regrettably **could not** perform the essential functions of his position, with or without accommodation. [SOMF ¶65]. Most troubling was Page 5 of the Emory Report, which evidenced a severe decline in Plaintiff's executive functioning in "planning, strategy, and problem solving" (Plaintiff scored worse than 99.9% of people in this area based on standard deviations), critical functions of Plaintiff's software developer position. [SOMF ¶66]. The Emory Report specifically stated that "[Plaintiff] evidenced behaviors suggestive of difficulty with executive functioning throughout testing." [SOMF ¶67].

The Emory Report also identified significant behavioral issues – similar to those witnessed by Goins and his team after Plaintiff returned from leave. For example, Page 5 stated that "[Plaintiff] had 4 set loss errors, indicative of significant impulsivity. He became quite distressed during the task, repeatedly stating it was illogical and he required significant encouragement to continue participating in it." [SOMF ¶68]. The Emory Report further stated, "[Plaintiff] struggles with

impulsivity and novel tasks that require mental flexibility." [SOMF ¶69]. Further, the Emory Report noted that throughout the testing:

> [Plaintiff] exhibit[ed] significant distress. When tasks were particularly difficult, [Plaintiff] tended to pausing [sic] to drink water and taking abrupt bathroom breaks when asked to provide answers he was uncertain about. As the day progressed, he became increasingly hyper verbal and impulsive, frequently interrupting tests to talk about how distressed he has been . . . [Plaintiff] tended to begin tests before hearing the full instructions, despite being repeatedly redirected to wait.

[SOMF ¶70].

Finally, the Emory Report noted significant issues with Plaintiff's visuoconstructional performance and processing speed. Page 4 of the Emory Report noted that Plaintiff's "visual motor scanning was severely impaired [], largely due to [Plaintiff's] difficulty finding stimuli on the left side of the page, but was slow and disorganized in his performance overall." [SOMF ¶71]. This meant that Plaintiff was consistently missing critical stimuli on his left side, which would make coding nearly impossible. [SOMF ¶73].

During the April 9 call, Drs. Jones and Cheng went over the Emory Report with Plaintiff in detail. [SOMF ¶74].[7] Drs. Jones and Cheng explained the issues from the Emory Report and their medical determination that he could not perform

[7] Plaintiff testified that he has no memory of this call or what was discussed. [Pl.'s Dep. 163:5-164:11]. In fact, Plaintiff stated he did not "remember much of 2018" in general. [Pl.'s Dep. 163:24].

the essential function of his position. [SOMF ¶75]. Plaintiff became emotional and erratic during the call. [SOMF ¶76]. Plaintiff began yelling at Drs. Jones and Cheng about the results, insisting he had no deficits or restrictions. [SOMF ¶77]. Then, Plaintiff's wife and children – who were not supposed to be on the confidential call – began intervening on Plaintiff's behalf and further yelling at Drs. Jones and Cheng about their conclusions. [SOMF ¶78]. As a result, Drs. Jones and Cheng were forced to end the call. [SOMF ¶79].

Effective May 17, 2018, GM separated Plaintiff's employment based on the medical determination that Plaintiff could not perform the essential functions of his position. [SOMF ¶80]. The decision to terminate Plaintiff's employment was made by HR (Fortenberry and Gutierrez) based on the objective medical determination of GM Medical (Drs. Jones and Cheng). [SOMF ¶81]. Goins was not involved in the termination decision. [SOMF ¶82].

## II. ARGUMENT

### A. Legal Standard.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavit[s], if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Here, Plaintiff brings four

claims: (1) Title VII discrimination based on race and national origin; (2) Title VII retaliation; (3) ADA discrimination; and (4) ADA retaliation. [Doc. 01]. GM is entitled to summary judgment on each claim.

**B. Plaintiff's Race and National Origin Claims Fail.**

Plaintiff is South Asian and originally from India. [Doc. 01, ¶10]. Plaintiff alleges he was unlawfully denied a discretionary bonus in February 2017. [Doc. 01, ¶34; Pl.'s Dep. 189:19-191:4]. Plaintiff also vaguely alleges that Goins required him to get help from a co-worker when he did not need help (discussed above), and that he was terminated – all allegedly on the basis of his race and/or national origin [Pl.'s Dep. 185:24-186:4; 190:15-191:3; Doc. 01, ¶63].[8]

The majority of Plaintiff's claims are time barred; but regardless, Plaintiff's "evidence" in support of these claims is woefully deficient. Plaintiff's only evidence of race and/or national origin discrimination is, "I'm a different race. The way he [Goins, African-American] talked to me . . . they don't do that to their own race." [Pl.'s Dep. 191:20-24]. In fact, Plaintiff speculated, "[t]he evidence is . . . I'm a different race, they don't really treat me nice. If I'm not this race and was some other

---

[8] In his Complaint, Plaintiff claims Woodard received a promotion over him and this was somehow related to race. [Doc. 01, ¶¶21-25]. However, Woodard did not receive any promotions during Plaintiff's employment and Plaintiff has no evidence of same. [SOMF ¶83]. Plaintiff also has not produced any evidence that he applied for or was denied any promotions.

race, they definitely would treat me differently." [Pl.'s Dep. 185:11-15]. Plaintiff admits that he has no evidence of discriminatory comments, and that he cannot identify any co-workers (of any race) who were treated better than he was. [Pl.'s Dep. 183:22-25; 187:17:-22; 193:1-24]. Fatally, Plaintiff could not identify anyone at GM who treated him unfairly on the basis of his race or national origin. [Pl.'s Dep. 186:2-187:5]. Plaintiff's race and national origin claims are entirely speculative and must be dismissed.

**1. The majority of Plaintiff's race and national origin claims are time-barred.**

In Georgia, a putative plaintiff is required to file an EEOC Charge within 180 days of an alleged discriminatory act. *See Green v. Union Foundry Co.*, 281 F.3d 1229, 1233–34 (11th Cir. 2002). Here, Plaintiff filed his Charge of Discrimination with the EEOC on July 3, 2018. [SOMF ¶84]. As a result, Plaintiff cannot recover for alleged discrimination on the basis of any action or event prior to January 4, 2018. Plaintiff admits that the "co-worker assistance" incident involving Sun occurred in May 2016 and the "bonus" incident occurred in February 2017. [SOMF ¶85]. Both of these incidents are time-barred adverse actions. Plaintiff's May 2018 termination is the only timely (albeit baseless) allegation of race and/or national origin discrimination.

### 2. Plaintiff cannot establish a *prima facie* case of Title VII Discrimination.

As Plaintiff does not allege any direct evidence of discrimination, in order to prevail, he must prove: (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he was qualified to do the job in question; and (4) that GM treated similarly situated employees outside his protected classification more favorably. [SOMF ¶86]. *See Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220 (11th Cir. 2019); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[9] Plaintiff cannot meet this burden.

Here, Plaintiff cannot show that GM treated similarly situated employees outside his protected classification (i.e., those of a different race or national origin) more favorably. *See McDonnell Douglas Corp.*, 411 U.S. at 802. In fact, Plaintiff admits that he cannot identify **<u>any GM employee</u>** (regardless of race or national origin) who was (1) treated more favorably as it relates to bonuses or work assignments, or (2) allowed to return to work with similar impairments. [Pl.'s Dep.

---

[9] Plaintiff is a member of a protected class (with respect to race and national origin), and suffered the adverse action of termination. However, Plaintiff did not suffer an adverse action when Goins asked him to get help from a co-worker. *White v. Hall*, 389 Fed.Appx. 956, 960 (11th Cir. 2010) ("non-substantial changes in work assignments are not adverse actions").

106:14-107:4; 188:20-24; 193:7-24]. As a result, Plaintiff cannot establish his *prima facie* case.[10]

### 3. Plaintiff cannot show that GM's legitimate, non-discriminatory reasons for its employment decisions are pretext for discrimination.

GM has articulated a legitimate, non-discriminatory reason for all actions taken. First, Goins asked Sun to help Plaintiff to catch him up on the project's progression because Plaintiff had been out of work for his son's graduation. [SOMF ¶14]. Second, Plaintiff did not receive a discretionary bonus in February 2017 due to his poor performance review. [SOMF ¶41]. Finally, GM terminated Plaintiff because he could not perform the essential functions of his position. [SOMF ¶80]. *See Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994) (explaining defendant's "exceedingly light" burden to produce a nondiscriminatory reason). The burden thus shifts to Plaintiff to prove pretext.

To prove pretext, Plaintiff must present "evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Batson v. Salvation Army*, 897 F.3d 1320, 1329 (11th Cir. 2018). Plaintiff has not produced any evidence of

---

[10] Defendant further disputes that Plaintiff was qualified for his position, based on the Emory Report and as discussed in Section II(C)(2), *infra*.

pretext. [Pl's Dep. 185:8-189:5].[11] Several facts weigh heavily against pretext. Plaintiff identifies Goins as the alleged "bad actor." [Doc. 01 ¶¶24, 36-39]. Not only did Goins hire Plaintiff (with no consideration of his race or national origin), but Goins played no role in Plaintiff's termination. [SOMF ¶82]. And Plaintiff does not allege that the actual decision makers (HR and GM Medical) harbored discriminatory animus against him. [Pl.'s Dep. 164:16-165:17].

**4. Plaintiff cannot establish a claim for Title VII retaliation.**

To establish a *prima facie* case of Title VII retaliation, Plaintiff must demonstrate that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the protected activity was the "but for" cause of the adverse action. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("but-for causation . . . requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.").

**a. Plaintiff's protected activity.**

Plaintiff engaged in protected activity when he filed his Charge of Discrimination in July 2018, months after his termination. [Pl.'s Dep. 189:10-18; Ex. 28]; *see also Manley v. DeKalb Cty., Georgia*, 587 F. App'x 507, 512 (11th Cir.

---

[11] Pretext is further discussed in the ADA section II(C)(3), *infra*.

2014) (no retaliation where adverse action occurs before protected activity). Prior to July 2018, Plaintiff did not engage in any statutorily protected activity under Title VII.[12] For example, Plaintiff did not make any complaints to HR about race or national origin discrimination. [SOMF ¶87]. Plaintiff only testified to one complaint during his employment – that he did not receive a bonus. [Pl.'s Dep. 176:9-19].[13]

**b. Plaintiff cannot prove causation.**

Plaintiff's retaliation claim also fails because he cannot establish a causal connection between any protected activity and his termination (or any other allegedly adverse action). Plaintiff first complained about his bonus (which did not include complaints of race or national origin discrimination) in February 2017 – and he was terminated over a year later. *Summers v. Winter*, 303 Fed. Appx. 716, 720 (11th Cir. 2008) ("a time gap of three months or more does not establish a causal connection"). Further, Plaintiff cannot show that GM Medical was aware of any protected activity at the time they determined Plaintiff could not perform the

[12] Plaintiff emailed GM CEO Mary Barra about various concerns in January 2018, and alleged "racially motivated harassment" therein. [SOMF ¶92]. He emailed Ms. Barra multiple times about his bonus denial but did not mention discrimination or harassment in any other email. Regardless, GM's CEO played no part in Plaintiff's termination, and Plaintiff neither alleges a harassment claim nor has evidence that the email played any part in his termination. [SOMF ¶93].

[13] The bonus incident occurred in February 2017, so any retaliation claim relying thereon is time-barred, as explained in Section II(B)(1). Plaintiff does not allege any protected activity that occurred prior to February 2017.

essential functions of his position. [SOMF ¶88]. *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) ("a plaintiff must generally establish that the [decision maker] was actually aware of the protected expression at the time it took adverse employment action"). The sole reason for Plaintiff's termination was the GM medical team's reasonable conclusion that Plaintiff was not able to perform the essential functions of his job. [SOMF ¶¶80-81].[14] Therefore, Plaintiff can neither prove a *prima facie* case of retaliation nor prove pretext, and his retaliation claim fails as a matter of law.

**C. Plaintiff's ADA Claims Fail.**

The ADA provides that no covered employer "shall discriminate against a qualified individual on the basis of a disability." *Knowles v. Sheriff*, 460 Fed. Appx. 833, 834 (11th Cir. 2012) (quoting 42 U.S.C. § 12112(a)). Plaintiff alleges both discrimination and retaliation based on his alleged disability. [Doc. 47].[15] Plaintiff primarily alleges he was terminated despite being allegedly able to perform his

[14] And, for the same reasons explained in Section II(B)(3), Plaintiff could not show pretext even if he could somehow establish a *prima facie* case of retaliation.

[15] The ADA also recognizes a cause of action for failure to accommodate. *Knowles*, 460 F. App'x at 834. Plaintiff, however, does not allege a failure to accommodate his disability. [Doc. 01]. Plaintiff testified that he neither needed nor requested any accommodations. [SOMF ¶89].

Senior Java Developer role. [Pl.'s Dep. 174:4-175:5; 182:1-20; Doc. 01, ¶¶75-83]. As discussed below, Plaintiff's ADA discrimination and retaliation claims fail.

**1. Plaintiff cannot prove a *prima facie* case of disability discrimination.**

To establish a *prima facie* case of disability discrimination, Plaintiff must show: (1) he has a disability; (2) he is qualified to perform the essential functions of the position with or without reasonable accommodation; and (3) his employer discriminated against him because of his disability. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001).[16] Plaintiff cannot meet his burden.

**a. Plaintiff is not a qualified individual.**

Plaintiff must prove that he is a "qualified individual," that is, someone "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). Essential functions "are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Earl*, 207 F.3d at 1365. Importantly, "consideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8). Here, it is undisputed that

[16] This is an odd case where Plaintiff alleges that he is not disabled. [SOMF ¶90]. Giving Plaintiff (*pro se*) the benefit of the doubt, GM presumes that Plaintiff claims that GM "regarded him" as disabled. *See* 42 U.S.C. § 12102(2).

coding, working closely with team members, identifying software issues, and problem-solving are essential functions of Plaintiff's position. [SOMF ¶¶7-9].

Plaintiff's behavior and performance following his stroke, as well as the Emory Report and the GM Medical analysis thereof prove that he could not perform the essential functions or his job, with or without accommodation. Plaintiff offers three pieces of evidence in an attempt to establish he could perform the essential functions of his job. First, his self-serving testimony. [Pl.'s Dep. 174:20-175:10]. Second, that his other doctors released him to return to work. [Pl.'s Dep. 169:3-4]. And last, he obtained an allegedly similar job after his termination. [Pl.'s Dep. 167:12-168:5].

None of this "evidence" creates a genuine dispute of material fact and does not establish that Plaintiff was qualified for the GM job. Plaintiff's subjective belief that he is a qualified individual is not probative. *See e.g.*, *Rogers v. Norman W. Fries, Inc.*, 418 F. Supp. 3d 1295, 1306 (S.D. Ga. 2019) (rejecting plaintiff's argument that he "believed" he was a qualified individual); *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1121 (10th Cir. 2004) (same). Nor is Plaintiff's testimony that his other doctors released him to return to work. Plaintiff cannot show that these other doctors reviewed his job description, performed pertinent neuropsychological testing, or opined that Plaintiff could perform the essential

functions of his position at GM. [Pl.'s Dep. 169:70-170:23]. *Jennings v. Dow Corning Corp.*, 2013 WL 1962333, at *5 (E.D. Mich. May 10, 2013) (rejecting return-to-work note where the note "did not address [limitations at issue] or many any indication concerning Plaintiff's ability to perform [his specific] position"). Last, that Plaintiff was able to get another, allegedly-similar job is not probative because Plaintiff cannot show that his subsequent employer knew about the Emory Report or his cognitive and behavioral limitations. [Pl.'s Dep. 63:25-64:6; Ex. 2].[17]

**b. GM did not terminate Plaintiff because of a disability.**

Assuming *arguendo* that Plaintiff is a qualified individual, GM still prevails because Plaintiff cannot show that he was terminated "because of" his disability. *Lucas*, 257 F.3d at 1255. Fatal to his claims, Plaintiff cannot show "that he was treated less favorably than a similarly-situated employee without a disability." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262–63 (11th Cir. 2007). Plaintiff cannot identify any co-worker who engaged in similar conduct, displayed similar performance struggles, and/or suffered similar neuropsychological deficits, but was not terminated. Pl.'s Dep. 193:15-24. This precludes Plaintiff from establishing a *prima facie* case of disability discrimination. *Wright v. Hosp. Auth. of Houston Cty.*, 2009 WL 274148, at *13 (M.D. Ga. Feb. 3, 2009) (no ADA violation because

[17] Plaintiff offers nothing except his self-serving testimony that the positions were similar. [Pl.'s Dep. 174:23-175:10].

plaintiff failed to "show[] that [employer] knew of similar potential risks posed by other employees" and acted differently). GM terminated Plaintiff for a legitimate non-discriminatory reason, as discussed above, and Plaintiff has no evidence of pretext.

### 2. The ADA permits GM to require Plaintiff to undergo testing, and to reasonably rely on the results.

The ADA permits employers to require employees to undergo medical testing where "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).[18] In *Owusu-Ansah v. Coca-Cola Co.*, the Eleventh Circuit rejected an ADA claim where an employer required a volatile employee to undergo neuropsychological testing, under similar facts. 715 F.3d 1306, 1309 (11th Cir. 2013). The employer became concerned after an employee "banged his hand on the table [] and said that someone was 'going to pay for this'" during a meeting. *Id.* The Eleventh Circuit affirmed summary judgment for the employer after a company physician recommended the employee be placed on leave and undergo psychological testing. *Id. see also Wright*, 2009 WL 274148, at *11 (hospital lawfully required a nurse with hearing loss to undergo testing following similar concerns).

---

[18] Plaintiff does not allege a violation of 42 U.S.C. § 12112(d)(4)(A). [Doc. 01].

Both *Owusu-Ansah* and *Wright* show that GM did not violate the ADA. After Plaintiff returned from leave for his stroke, Goins and Plaintiff's co-workers noted Plaintiff's erratic, volatile behavior. [SOMF ¶¶32-33]. Further, Plaintiff fell behind on his projects and struggled with even basic tasks. [SOMF ¶34]. Then, during a routine performance meeting, Plaintiff became agitated, began yelling, and shouted that he would "die for the truth." [SOMF ¶45]. After Plaintiff refused to meet with HR, he was scheduled for an evaluation with GM's medical team. [SOMF ¶¶47-53]. GM's medical team recommended Plaintiff be placed on leave until he underwent neuropsychological testing. [SOMF ¶57]. GM's medical team analyzed the test results and applied them to Plaintiff's specific role to determine that he was not fit to return to work. [SOMF ¶65]. This is exactly what the ADA allows—it does not force employers to employ individuals who cannot perform their jobs.

In *Owusu-Ansah*, the employee was returned to work based on the test results. 715 F.3d at 1309. But the ADA does not require that an employer return the employee ***if*** the results show the employee cannot perform the essential functions of the position. *See e.g.*, *Pesterfield v. Tennessee Valley Auth.*, 941 F.2d 437 (6th Cir. 1991) (employer "was entitled to terminate the plaintiff because it reasonably believed, based primarily on the medical report, that it could not accommodate the plaintiff's [] condition"); *Jennings*, 2013 WL 1962333, at *5 (employer "was

entitled to conclude that Plaintiff could not perform the essential functions of the [] position" where the in-house physician reviewed the pertinent medical information and closely reviewed the plaintiff's evaluation results, noting "[t]his is exactly the type of individualized inquiry . . . the ADA demands"); *Jones v. Walgreen Co.*, 765 F. Supp. 2d 100, 104 (D. Mass. 2011) (no ADA violation where employer based its determination that Plaintiff could not perform the essential functions of her job on the plaintiff's medical report); *Desmond v. Yale-New Haven Hosp., Inc.*, 738 F. Supp. 2d 331, 340 (D. Conn. 2010) (same).

To hold the opposite would yield an absurd result. The ADA authorizes employers to require testing to determine whether an employee can perform the essential functions of his position. 42 U.S.C. § 12112(d)(4)(A). Where, as here, the employer's medical team subsequently analyzes the resulting report, interviews the employee, and reviews other relevant documents, it does not violate the ADA to terminate the employee based on that thorough, individualized inquiry. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (courts do not "sit as a super-personnel department that reexamine[] an entity's business decisions").

**3. Plaintiff cannot show pretext.**

Even if Plaintiff could establish a *prima facie* case of disability discrimination, GM is still entitled to summary judgment because, again, Plaintiff

cannot show pretext. *Todd v. McCahan*, 158 F. Supp. 2d 1369, 1376 (N.D. Ga. 2000); *see also* discussion Section II(B)(3), *infra*.

Several material facts weigh against discrimination and pretext. For example, when Plaintiff suffered a stroke, GM granted him 5 months of leave and returned him to his same position thereafter. [SOMF ¶¶29-31]. If GM harbored some discriminatory animus, why allow him to return the first time? Furthermore, the GM Medical team did not simply peruse Plaintiff's records or make brash conclusions. Rather, they requested an analysis from a third party specialist, provided Plaintiff with approximately 12 months of additional leave, meticulously analyzed the Emory Report, reviewed Plaintiff's medical file and job description, and conducted their own evaluation of his ability to do his job. [SOMF ¶¶57; 62-65]. Plaintiff has not produced a shred of evidence of any discriminatory behavior or intent.

**4. Plaintiff cannot prove a *prima facie* case of ADA retaliation.**

To state a claim for retaliation, "a plaintiff must allege that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) a causal link between the two events exists." *Palmer v. McDonald*, 624 Fed. Appx. 699, 702 (11th Cir. 2015). The third element requires a showing of the heightened but-for causation standard. *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016). Fatal to his claims, Plaintiff does not allege that he "opposed

any act or practice made unlawful by [the ADA]" whatsoever. 42 U.S.C. § 12203(a). Plaintiff fails to allege that he "made a charge testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [the ADA]" until after his termination. *Id.* Plaintiff remains unable to prove that any protected activity was the "but for" cause of his termination. *Frazier-White*, 818 F.3d at 1258. It is undisputed that GM terminated Plaintiff solely based on the medical determination that Plaintiff could not perform the essential functions of his position. [SOMF ¶80]. As a result, Plaintiff cannot establish a *prima facie* claim for retaliation. Even if Plaintiff could establish a prima facie claim of retaliation, GM is still entitled to summary judgment because Plaintiff cannot show that GM's legitimate, non-retaliatory reasons for terminating his employment were pretextual. *See* discussion Sections II(B)(4) & II(C)(3), *supra*.

As a result, there is no genuine dispute of material fact as to Plaintiff's claims under the ADA and the Court should dismiss these claims with prejudice.

## III. <u>CONCLUSION</u>

For the foregoing reasons, GM respectfully requests that summary judgment be entered in GM's favor and Plaintiff's claims be dismissed with prejudice.

Respectfully submitted this 24th day of February, 2021.

*<u>/s/Luke Donohue</u>*
Deepa N. Subramanian

Georgia Bar No. 278625
deepa.subramanian@ogletree.com
Luke P. Donohue
Georgia Bar No. 193361
luke.donohue@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
191 Peachtree Street, NE, Suite 4800
Atlanta, GA 30303
T: (404) 881-1300; F: (404) 870-1732

Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| KOTESHWAR VELUDHANDI, Plaintiff, vs. GENERAL MOTORS LLC, Defendant. | ) | CIVIL ACTION NO: 1:19-CV-03892-JPB-CCB |

**CERTIFICATE OF SERVICE**

I certify that on February 24, 2021, I filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, and served a copy on the Pro Se Plaintiff via email and via Federal Express to the following address:

Koteshwar Veludhandi
6342 Grand Loop Road
Sugar Hill, Georgia 30518
Kotesh2003@yahoo.com

*/s/ Luke Donohue*
Luke P. Donohue
Georgia Bar No. 193361